UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SCOTT GOUDY,

    Plaintiff,

     v.                                 Civil Action No.

PORTLAND AIR FREIGHT, INC.

    Defendant.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Scott Goudy ("Plaintiff or "Goudy"), by and through undersigned counsel, and complains against the Defendant, Portland Air Freight, Inc. ("Defendant" or "PAF"), as follows:

INTRODUCTION

1.      This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; and the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 831 *et seq.*

2.      PAF violated the ADA and the MHRA by denying Goudy a reasonable accommodation of consistently assigning him the same truck or assigning him a clean truck and terminating him because of his disability, because he requested and needed a reasonable accommodation, and because he opposed Defendant's failure to comply with its obligations under these laws.  PAF also violated the WPA by terminating Goudy in retaliation for reporting its violation of the ADA and MHRA and reporting a practice or condition that endangered his health and safety.

1

## PARTIES

3.      Goudy is a United States citizen residing in Hanover, Pennsylvania.

4.      PFA is a Maine corporation with its principal place of business in Scarborough, Maine in Cumberland County.

## JURISDICTION

5.      At all times material to this Complaint, PAF had approximately 80 employees.

6.      PAF had more than 15 employees in each of 22 or more calendar weeks in calendar years 2015 or 2016.

7.      The amount in controversy in this matter exceeds $75,000.

8.      This Court has subject matter jurisdiction over Goudy's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

9.      In March 2017, Goudy filed a timely Charge/Complaint of Discrimination against PAF alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10.     On or about October 3, 2017, the MHRC issued a Notice of Right to Sue with respect to Goudy's state law claims.

11.     On or about October 4, 2017, the EEOC issued a Notice of Right to Sue with respect to Goudy's federal law claims.

12.     Goudy has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

<u>FACTUAL ALLEGATIONS</u>

13.     PAF is a transportation company that provides service to and from the Boston, Portland, and Bangor airports as well as truckload and less than truckload service operating primarily east of the Mississippi.

14.     PAF operates three terminals in Maine including Scarborough, Bangor, and Presque Isle.

15.     Alan Reed is the President and CEO of PAF.

16.     Mike Euloth is the Safety Director.

17.     Goudy started working for PAF as a driver on March 28, 2016.

18.     His starting rate of pay was $18.50 per hour.

19.     He received a positive review after 90 days and a pay raise to $19.00 per hour effective July 31, 2016.

20.     Goudy was on track to receive another raise to $19.50 by November 1, 2016.

21.     He worked on average about 46 to 50 hours per week.

22.     Goudy suffers from a serious, lifelong skin disorder.

23.     Skin is the largest organ of the human body with a total area of about 20 square feet. Skin protects humans from microbes and the elements, helps regulate body temperature, and permits the sensations of touch, heat, and cold.

24.     It is episodic in nature.

25.     When it flares up, Goudy has red, itchy, weepy rashes and inflammation on one or more parts of his body including his arms, behind his knees, inside his elbows, on his upper and/or lower arms, and on his neck.

26.     Environmental conditions such as dust, dirt, soaps, and heat aggravate it.

3

27.     Goudy's skin disorder significantly impairs his physical health, particularly when viewed without mitigating measures such as treatment.

28.     Goudy's skin disorder substantially limits the functioning of his skin, a bodily system.

29.     Goudy's skin disorder substantially limits major life activities including the performance of a broad range of jobs that involve contact with environmental conditions such as dust, dirt, soaps, and heat.

30.     Goudy's skin disorder meets the definition of disability under the MHRA and ADA.

31.     Goudy not only has an actual disability under the MHRA and ADA, he is treated by others as having something seriously wrong with him and is regarded as a person with a substantial disfigurement and physical impairment.

32.     When Goudy has flare-ups, some people are afraid to touch him and/or express fear about the rash and inflammation on his face, neck and arms. Goudy has to reassure people frequently that his skin condition is not contagious.

33.     Goudy had a flare-up of his skin disorder that began during the winter of 2015-2016.

34.     It got worse when the weather warmed during the spring and summer of 2016. His condition was active throughout the time he was employed by PAF.

35.     Goudy was up front with Reed and Euloth about his skin condition and told them about his need for reasonable accommodations when he was hired.

36.     Goudy told Euloth that he could not wear the RAF uniform because exposure to polyester would aggravate his rash.

4

37.     PAF provided Goudy with the option of wearing cotton instead of polyester.

38.     Apparently this request was easy for PAF to grant and did not cause resentment or ill will.

39.     PAF admits that Goudy requested and was granted this accommodation for his skin impairment.

40.     PAF denies that Goudy requested assignment to a clean truck as an accommodation for his skin condition but Goudy's version of events is more plausible.

41.     PAF admits that Goudy and Euloth had a conversation about having a designated truck when Goudy was hired.

42.     Goudy told Euloth that he needed a clean truck because, in addition to his sensitivity to polyester, he is also sensitive to dirt, dust and cleansers.

43.     Goudy also told Euloth that it was unsafe for Goudy to drive a dirty truck because it aggravated his skin disorder and caused him to seek medical attention and treatment.

44.     Goudy has had years of experience dealing with his skin disorder; it makes sense that he would be very up front with PAF about his needs.

45.     PAF does not ordinarily guarantee its drivers will be assigned designated trucks although it does make an effort to assign drivers the same truck on a regular basis.

46.     PAF has a practice of assigning the next available truck to a driver if, for some reason, the truck that the driver usually drives is not available.

47.     Goudy requested an accommodation to PAF's usual policy and practice about truck assignments.

48.     He requested that he be regularly assigned to one truck that he could count on to be hygienic and free of chemical residues from harsh cleansers.

49.     Goudy used ordinary words and concepts when he asked PAF for the reasonable accommodation of an assigned truck.

50.     Goudy engaged in protected activity for purposes of the MHRA, ADA, and WPA when he asked for this modification to PAF's usual policy.

51.     Euloth did not engage in the interactive process to assess if Goudy's request could be granted or if an alternative would be just as effective.

52.     All Euloth said was that he would provide Goudy with a "safe working environment."

53.     Unfortunately, what is "safe" for the ordinary driver was not "safe" for Goudy due to his serious, life-long skin condition.

54.     Pursuant to PAF's standard practice, Goudy was usually assigned to truck #226 which was acceptable.

55.     However, #226 was not always available and Goudy would have to drive another truck which aggravated his skin disorder.

56.     Goudy had to see a doctor or go to the hospital emergency room in connection with his skin disorder five times while he was employed by PAF.

57.     On one occasion Goudy asked his supervisor, the night dispatcher Steve Kurz, for permission to leave work to go to the ER.

58.     Goudy's neck was swollen and weeping fluids and he couldn't function.

59.     Goudy engaged in protected activity under the MHRA, ADA, and WPA when he reported to Kurz that he needed to go to the ER for treatment because driving an unsafe truck aggravated his skin condition so badly that Goudy couldn't function.

60.     Kurz denied Goudy's request, stating that Goudy did not give enough notice.

6

61.    After needing medical treatment for a number of flare-ups, Goudy told Euloth about his doctor and ER visits for treatment of his skin disorder.

62.    Goudy told Euloth that no one was meeting him half way to solve the problem, and that no one was taking his skin disorder seriously.

63.    This report by Goudy reiterating his need for accommodation and the impact of PAF's refusal to accommodate him constituted another instance of protected activity for purposes of the MHRA, ADA, and WPA.

64.    Euloth told Goudy that it was not possible to stay clean because Goudy is a truck driver.

65.    Goudy was insulted by this negative stereotype about truck drivers. There are lots of trucks and lots of drivers who are very clean.

66.    Goudy asked Euloth if he had an employee who was allergic to fish, would he throw a fish party and make that employee attend?

67.    Euloth said no.

68.    Goudy told Euloth, "With all the trucks that PAF owns, you could assign me a clean truck and stop taking it away."

69.    Euloth told Goudy that they could not keep the trucks clean inside and that he had to live with it or go work somewhere else.

70.    On July 9, 2016, Goudy had a discussion with a dispatcher, F.G. about assigning him his usual truck #226.  F.G. refused to assign Goudy his usual truck even after Goudy explained his need for the clean truck as an accommodation for his skin disorder and that putting him in a dirty truck would trigger his systems.  Goudy was assertive but not aggressive or threatening.

7

71.   F.G. denied Goudy's request and refused to assign him a clean truck.

72.   PAF claims that on July 9, 2016, Goudy yelled, swore, slammed a door and threatened to punch a wall in the presence of a dispatcher, F.G.

73.   Goudy agrees that he told F.G. that he needed to be assigned to truck #226 because of his skin condition which is protected activity under the MHRA, ADA, and WPA.

74.   Goudy agrees that it was frustrating that PAF had not instructed F.G. to accommodate Goudy's disability but denies that he was aggressive, threatening, or abusive toward anyone.

75.   F.G.'s refusal to provide Goudy with a clean truck constituted an unlawful failure to accommodate Goudy's disability for purposes of the MHRA and ADA.

76.   On about Friday, August 12, 2016, a new dispatcher, J.W., was handing out trucks and assignments to drivers.

77.   She was not familiar with the trucks or the drivers so Goudy introduced himself and told her that he was normally assigned to truck #226.

78.   She told Goudy that the truck was not back yet.

79.   He said that was okay, he was an hour and a half early, and he would wait.

80.   When Goudy returned at about midnight, J.W. had a list of trucks and keys in a bucket and told Goudy that she was going to assign him to an old Volvo truck.

81.   Goudy told J.W. that he could not take that truck. He introduced himself again and explained that he was the driver with the skin condition and that he needed a truck that was dust free and clean, maybe she was not told about him.

82.   J.W. appeared upset that Goudy would not simply accept the truck she wanted to assign him.

83.    Goudy explained repeatedly and calmly that he needed the clean truck as an accommodation for his condition and that if he was required to use a dirty truck that it would trigger significant symptoms and could lead him to require hospital treatment.

84.    J.W. still refused to assign Goudy to a clean truck.

85.    J.W.'s refusal to provide Goudy with a clean truck constituted an unlawful failure to accommodate Goudy's disability for purposes of the MHRA and ADA.

86.    PAF alleges that during the conversation where Goudy explained to J.W. his need for reasonable accommodation that he was making threatening gestures and that he then left and returned to the building and verbally assaulted J.W.

87.    J.W., like F.G., refused to assign Goudy a clean truck.

88.    PAF's characterization of the conversation is false.

89.    In a statement provided by PAF to the MHRC, J.W. admits that Goudy told her that he had severe "allergies [skin reaction] to dirty trucks and clean trucks that had been cleaned with certain products."

90.    J.W. also admits that when truck #226 was not back by midnight Goudy told her that "nobody takes his skin condition seriously."

91.    J.W. admits that after Goudy checked the other truck that J.W. assigned to him, he reported back that the truck was "actually clean as far as trash and stuff went but was still not good for his skin condition. He thought it may also have been cleaned with products that were too harsh for his skin."

92.    Goudy was upset and frustrated that PAF had again failed and refused to accommodate his disability but he was not angry, irrational, aggressive, or threatening in any way as alleged.

93.     Goudy did not receive any work after Friday, August 12, 2016.

94.     He texted Kurz for his schedule.

95.     Over the weekend, Kurz called Goudy back and said he did not have a run for him.

96.     He told Goudy that Euloth told him to take Goudy off the schedule because of "the fight."

97.     Goudy said, "What fight?" Kurz told Goudy that J.W. claimed that Goudy threw some keys in the bucket.

98.     PAF states that Goudy was terminated at that time for displaying hostile, aggressive, insubordinate and threatening behavior on two occasions, July 9, 2016 and August 12, 2016.

99.     Goudy disputes PAF's claims about his conduct.

100.    On the two occasions in question, Goudy was simply asking PAF dispatchers to honor his request for a clean truck to accommodate his skin disorder and not to put him in a truck that would trigger my symptoms.

101.    He was never aggressive or threatening.

102.    PAF concedes that it terminated Goudy for his protected activity and attempts to mischaracterize his protected activity as something warranting discipline.

103.    This is direct evidence of retaliation.

104.    PAF knew or should have known that Goudy was upset and frustrated on July 9, 2016 and August 12, 2016 because PAF had failed and refused to grant Goudy a reasonable accommodation in connection with truck assignments.

105.    Goudy was able to perform the essential functions of his job with the reasonable accommodation of being assigned the same truck for his routes or if that was not possible to assign him a clean truck that did not trigger his symptoms.

106.    The accommodation requested by Goudy did not eliminate an essential function of the job of a truck driver.

107.    Providing the accommodation requested by Goudy would not have created an undue burden for PAF.

108.    PAF discriminated against Goudy on the basis of disability by terminating him from his employment because of his disability, because he was regarded as a person with a disability, and for reasons that could have been ameliorated by reasonable accommodation.

109.    PAF failed to reasonably accommodate Goudy as required by the MHRA and ADA by failing to engage in a good faith interactive process with Goudy when he requested accommodations, failing to provide him with reasonable accommodation on a number of discrete occasions including July 9, 2016 and August 12, 2016, and terminating Goudy rather than providing him with his accommodation.

110.    PAF retaliated against Goudy for requesting a reasonable accommodation and reporting a condition that was endangering his health and safety by terminating his employment because of his protected reports and requests and treating his protected activity as a factor in the decision to terminate his employment.

111.    PAF is not able to show that the accommodation proposed by Goudy was unreasonable.

112.    PAF is not able to show that the accommodation proposed by Goudy would have caused an undue financial or administrative burden or hardship.

11

113.    PAF is not able to show that no alternative reasonable accommodation existed that would have allowed Goudy to continue to perform his job.

114.    PAF unlawfully discriminated and retaliated against Goudy with malice or reckless indifference.

115.    As a result of PAF's unlawful discrimination against Goudy, he has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

116.    Goudy has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his treatment by PAF unless and until PAF is enjoined by this court.

<u>COUNT I: ADA – Disability Discrimination</u>

117.    Paragraphs 1-116 are incorporated by reference.

118.    Defendant's conduct violates the ADA's prohibition against disability discrimination.

<u>COUNT II: MHRA – Disability Discrimination</u>

119.    Paragraphs 1-118 are incorporated by reference.

120.    Defendant's conduct violates the MHRA's prohibition against disability discrimination.

<u>COUNT III: ADA – Retaliation</u>

121.    Paragraphs 1-120 are incorporated by reference.

122.    Defendant's conduct violates the ADA's prohibition against retaliation.

<u>COUNT IV: MHRA – Retaliation</u>

123.    Paragraphs 1-122 are incorporated by reference.

124.    Defendant's conduct violates the MHRA's prohibition against retaliation.

### COUNT V: WPA- Retaliation

125.    Paragraphs 1-124 are incorporated by reference.

126.    Defendant discharged Plaintiff because Plaintiff, acting in good faith reported to Defendant what Plaintiff had reasonable cause to believe was conditions or practices that violated the law and endangered the health and safety of an employee.

### COUNT VI: ADA – Failure to Accommodate

127.    Paragraphs 1-126 are incorporated by reference.

128.    Defendant failed to meet its obligation under the ADA to provide Plaintiff with reasonable accommodations.

### COUNT VII: MHRA – Failure to Accommodate

129.    Paragraphs 1-128 are incorporated by reference.

130.    Defendant failed to meet its obligation under the MHRA to provide Plaintiff with reasonable accommodations.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award nominal damages;

I.      Award attorney's fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability or retaliate in violation of state and federal law;

L.      Require  Defendant's CEO or President to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

M.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendant train all management level employees on the protections afforded by the MHRA, WPA, and ADA;

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant failed to provide him with reasonable accommodations and unlawfully terminated him because of disability discrimination and retaliation; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  November 22, 2017                    /s/ Chad T. Hansen
                                             Chad T. Hansen
                                             Peter L. Thompson

                                             Attorneys for the Plaintiff

                                             MAINE EMPLOYEE RIGHTS GROUP
                                             92 Exchange Street 2nd floor

14

Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
chansen@maineemployeerights.com